2026 IL App (2d) 250398-U
No. 2-25-0398
Order filed January 16, 2026

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

*In re* THE PARENTAGE OF A.C. & I.C., Minors.
(Julie Y., Petitioner-Appellee v. Howard C., Respondent-Appellant)

Appeal from the Circuit Court of Lake County.
Honorable Bolling W. Haxall, Judge, Presiding.
No. 12-F-804

JUSTICE HUTCHINSON delivered the judgment of the court.
Justices McLaren and Schostok concurred in the judgment.

## ORDER

¶ 1    *Held*: There was no error in the trial court's determinations concerning parental responsibilities and parenting time; the record shows the trial court was not biased, and the allocation order was consistent with the facts, the law, and in the children's best interests.

¶ 2    Respondent, Howard C., appeals from a judgment of the circuit court allocating parental responsibilities primarily to petitioner, Julie Y., and dividing parenting time equally between the parties. For the reasons that follow, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4    This case concerns the welfare of the parties' daughters, A.C. and I.C. While the record in this case is voluminous, we recite only what is necessary to decide this appeal.

¶ 5    A.C. was born in 2012 and I.C. was born in 2013. Julie filed the initial petitions for allocation of parental responsibilities, parenting time, and child support. Howard admitted paternity was adjudicated as the children's father. The parties proceeded largely with interim orders permitting Howard visitation.

¶ 6    In 2015, the trial court (Hon. Elizabeth M. Rochford) appointed attorney Marc Schwartz as guardian *ad litem* (GAL) for the children and appointed an outside parenting coordinator as well. The court tasked the GAL with investigating the parties' allegations and with making recommendations to the court regarding parental responsibilities and parenting time.

¶ 7    On September 25, 2017, the parties entered into an agreed judgment and parenting plan. Under that order, both parties would have joint decision-making responsibility. The children would primarily reside with Howard, and Julie would have three-hour visits two nights a week and overnights every other weekend.

¶ 8    On June 1, 2022, the parties entered a second agreed allocation judgment in which the court (Hon. Stephen M. DeRue) granted sole decision-making authority to Julie as well as the majority of parenting time. It appears that at this time, the children were primarily living with Julie at their maternal grandparents' home in Hawthorn Woods. Howard was allocated one overnight visit per week (Wednesdays), and visitation on alternating weekends.

¶ 9    In the months after this order was entered, Julie and Howard largely dispensed with their attorney's services, and each began proceeding *pro se*. This new phase of the litigation was marked by both parties filing serial multi-count petitions to modify the second allocation judgment, multiple petitions for indirect civil contempt, several "emergency" motions, and myriad replies and sur-replies thereto. As it pertains to modification of the parenting plan, each party alleged that

- 2 -

the other presented a danger to the minors and generally sought sole decision-making authority and exclusive parenting time.

¶ 10    The trial court (Hon. Bolling W. Haxall) held a consolidated hearing over four dates in April 2025. Although the court heard evidence on both of the parties' request for modification of 2022 judgment, as well as contempt petitions, we focus on the evidence concerning the modification as neither party challenges the trial court's contempt findings.

¶ 11    In addition, we note that while there are no transcripts of the hearing, the trial court judge received submissions from each party as proposed bystander's reports. See Ill. S. Ct. R. 323(c) (eff. July 1, 2017). The trial court judge noted that he first learned of the issue after receiving Howard's objections to Julie's proposed report, which was after the deadline had already passed pursuant to our scheduling order for the record on appeal and Rule 323(c). The trial court found that neither Julie's nor Howard's proposed reports were accurate, and it could not certify them. The trial court then prepared and certified its own bystander's report from its notes, the exhibits, and the parties' submissions. The trial court explained this process, and apologized for any delay, in a footnote of the certified report. We find good cause has been shown to excuse any delay, and the trial court has our appreciation for composing a thorough bystander's report, which was the parties' responsibility. We note, too, that without the trial court's report, we would be unable to discern which exhibits included in the record were admitted at the hearing. We commend the trial court for its commitment to "access to justice" and for providing the parties with an opportunity to seek a more fulsome review in this court than would have been possible otherwise.

¶ 12    We turn now to the hearing itself. At the hearing, the only non-party witness to testify was the  GAL, Marc Schwartz. According to Schwartz, he prepared several recommendations for the court, and conducted a meeting between the parties on October 29, 2024, to discuss his findings.

Schwartz, however, had to terminate the meeting within 10 minutes because Howard raised his voice and was increasingly "aggressive toward Julie."

¶ 13    Schwartz attempted to conduct another meeting over Zoom on February 19, 2025. During the meeting, he observed the "same aggressive behavior from Howard[,]" who declared he would not agree to any allocation of overnight parenting time to Julie. Despite these events, Schwartz testified that he continued to recommended the court allocate joint decision-making between the parties.

¶ 14    Relevant to this appeal, at some point Howard had alleged Julie had been consuming A.C.'s prescribed medication, Adderall, a stimulant to treat A.C.'s attention deficit disorder. According to Schwartz, Howard had claimed to be unaware A.C. was prescribed Adderall at all. Howard also alleged that Julie had given the children an adult dose of non-prescription sleep medications, such as melatonin and Unisom (which contains diphenhydramine, commonly known as "Benadryl"). When asked if A.C. had been sent to school without her prescription medication, Schwartz responded "if those were the facts, that would be concerning, yes." Schwartz testified that both he and the Department of Children and Family Services (DCFS) had investigated Howard's claims but had not found "concrete proof" of Julie's abuse or neglect. Schwartz also testified that Julie submitted a physician's note regarding the over-the-counter sleep aid. Schwartz had no reason to suspect the note was false, other than Howard's insistence that it was a forgery. Schwartz did not contact the physician because he believed Julie had discontinued giving the children that medication.

¶ 15    Schwartz explained that Julie often failed to communicate critical information concerning the children's medication, schedules, and school assignments to Howard. Schwartz also testified that A.C. received partial inpatient hospitalization for two weeks at Alexian Brothers Behavioral

Health Hospital in 2024 for suicidal ideation and depression. (A.C. was 11 at the time). A hospital report indicated that A.C. was struggling with depression, aggression and parental alienation, though as Schwartz noted, the report does not indicate which parent was responsible or which parent A.C. felt alienated from. Although not directly discussed by the parties in Schwartz's testimony, we note that the hospital report indicated that A.C. was angry with her father for calling DCFS on Julie. A.C. stated that she "doesn't know what to believe anymore[,]" that she knows "too much information about [her] parents[,]" which "causes overwhelming feelings and confusion and often leads to suicidal ideation."

¶ 16 Returning to the hearing, Schwartz stated that Julie was a "good parent" who had put her history of substance abuse behind her. In contrast, Schwartz opined that he found "Howard to be a very aggressive co-parent *** toward Julie." When asked about Julie being aggressive, Schwartz declined to characterize her that way, instead he said Julie "got frustrated." Howard then stated, "I would literally love to know when I've been aggressive." Many of the parties' emails and text messages were admitted, including some with the GAL. Schwartz noted that he may not have responded to some of Howard's emails about the children or the case, which Schwartz credited to the "extreme[ ] volume of communications" Howard sent.

¶ 17 Howard called Julie as his first witness. Howard asked Julie about giving the children an over-the-counter sleep medication. Julie replied that it was either "children's Unisom" or melatonin, and that it had been recommended by a pediatric neurologist. Julie admitted she did not initially tell Howard about giving the children an over-the-counter sleep aid because it did not require a prescription. Julie testified that she did not give it to the children "nightly" and testified that she never administered it consistently for more than two weeks. Julie identified two doctors who had recommended sleep aids, one of whom was Dr. Homsi, A.C.'s pediatric neurologist.

¶ 18    Julie testified that at some point, A.C. stopped taking Adderall at school. Julie was unsure if that occurred in November of 2022. Julie testified that Howard had access to all of the children's prescriptions and stated that she kept him informed of changes in the medication or dose. A.C.'s medication was changed from Adderall to Vyvanse some time in 2024. Multiple text and email exchanges concerning the pickup and administration of A.C.'s medication were admitted. Julie testified that she also took Vyvanse and denied having stolen any of A.C.'s medication.

¶ 19    Julie's psychologist's report was admitted into evidence. The report indicates that Julie lives with her parents, an older daughter from a prior relationship, and A.C. and I.C. In 2009, Julie graduated from Northern Illinois University with a bachelor's degree and a 4.0 GPA. Julie is employed full-time as a pharmacy liaison. Julie has a history of alcohol and substance abuse, but she has been sober since July 2017. She struggles with post-traumatic stress disorder, a personality disorder, ADD, and depression. Additionally, she is on the autism spectrum. Nevertheless, Julie has made significant progress through counseling and is able to function, manage her own affairs, and care for her three daughters.

¶ 20    Julie testified that she had occasionally been late meeting Howard when it was time to drop off the children for visitation. Documents related to A.C.'s individual education plans (IEPs) were admitted as well. Generally, they showed that A.C. was doing better in school and required less prompting by teachers. During one trial exchange, Howard asked if Julie had "thank[ed]" him for helping A.C. with missing homework assignments. Julie replied she did not think she needed to.

¶ 21    Julie next testified about an event the parties call the "Ghostbusters Incident." According to Julie, A.C. had taken "a" prescription medication (we do not know which one) that made her "extremely sleepy and difficult to rouse." Julie became concerned and called for an ambulance. Because of their white uniforms and her drowsiness, A.C. referred to the paramedics as

"Ghostbusters." Julie acknowledged that she did not contact Howard about this incident after it occurred. Julie did, however, speak to A.C.'s doctor and her prescription was "corrected."

¶ 22    An email exchange concerning A.C.'s hospitalization was admitted. The email was sent prior to A.C.'s admission. Howard asked Julie why she had not notified him earlier, and she responded that she had full decision-making authority and "didn't want to let [Howard] know until [A.C.] was let in to the program." Julie also testified that a doctor had advised against letting Howard know earlier.

¶ 23    Julie was asked about a binder A.C. submitted for a school project. The binder contained only pictures of the children, Julie, and Julie's now-former boyfriend. Howard asked why he was not included in the pictures and Julie testified that A.C. had selected them.

¶ 24    Howard then presented his own testimony. Howard testified that the children reported Julie frequently gave them sleep aids, and A.C. complained she could not sleep without them. Howard stated that he did not allow the children to take Unisom when they were with him, but that Julie had told the girls to "secretly take it anyway." Several pictures were admitted which showed pills in plastic baggies allegedly given to Howard by Julie. Howard testified that he called DCFS and Schwartz to investigate the minors' use of Unisom, but that Schwartz "didn't do anything." Howard testified that he believed Unisom did not make a children's version of its product with diphenhydramine, and that "the company's only child-specific product was melatonin."

¶ 25    With respect to the "Ghostbusters Incident," Howard testified that Julie had not previously informed him that A.C. "had O.D.'d." With respect to extracurriculars, Howard testified that Julie had signed the children up for band, orchestra, Girl Scouts, and summer school without his input. According to Howard, Julie also failed to list him as an emergency contact for one of I.C.'s physicians. With respect to the binder A.C. submitted for class, Howard testified that it "was made

because [A.C.'s] mom wanted to cross me out of their lives." To the extent the hospital report indicated A.C. "report[ed] emotional abuse with dad yelling at her frequently[,]" Howard denied doing so and claimed it was another example of Julie "poisoning" the children against him.

¶ 26    With respect to the GAL, Howard testified that he believed Schwartz discriminated against him "on the basis of socioeconomic status." According to Howard, he "grew up in ghettos" and "homeless shelters" and had not graduated high school. Howard believed that this influenced Schwartz's recommendations, and testimony, and urged the court to disregard all of it.

¶ 27    Howard was recalled as a witness during Julie's case in chief and Howard's psychological evaluation was admitted into evidence. In it, Howard reported that he has five children ranging from ages 7 to 17. Howard also claimed that Julie was the source of all of his "problems" and stress. Next, Howard was asked about his employment history and career goals. Howard testified that he planned to open an "adult Air BNB" where customers could "book entertainers directly and not through a company." According to Howard, he was never employed as an escort, but he has "danced." When asked about other employment prospects, Howard reported that he has "these ideas" that would "lower crime by 90%" and would use "[n]on-profit site" to spread them. Howard stated that he spends most of his time with his family and "a lot of time working on my companies." He testified that he has been in counseling for five years and "probably had problems before [he] met [Julie]."

¶ 28    Julie testified that she often received "crises reports" from A.C. during the time she spent with Howard. Julie again denied having taken any of A.C.'s medication. The parties then presented closing arguments. We note that the trial court appended Schwartz's final recommendation letter to the bystander's report as an exhibit the parties agreed to admit.

¶ 29    On August 13, 2025, the trial court issued a 15-page single-spaced memorandum opinion and order. The court's opinion explicitly stated that it had considered all relevant statutory and non-statutory factors in reaching its decision. The court found that A.C.'s brief, partial inpatient hospitalization constituted a substantial change in circumstances. The court found that while Julie had often failed to keep Howard apprised of events concerning the children, the court could not agree with Schwartz's recommendation to move to joint decision-making, or Howard's request for sole decision-making.

¶ 30    The trial court found that "[t]he record before the court—including the court's own observations between the parties—causes the court to conclude that [Julie] should be allocated sole-decision making as to education, health, and extra-curricular activities." The court noted that Howard was aggressive and often "overwhelmed" Julie. The court expressed that joint decision-making simply was "not tenable[,]" because under a joint-decision-making structure, Howard would harass Julie until he got his way. The court noted that the parties were largely in agreement regarding the children's religious upbringing and allocated joint decision making as to that area only. In all other respects, sole decision-making authority remained with Julie.

¶ 31    With respect to parenting time, the court stated, "There is no information to warrant a current restriction on either parent's time with the minors." The court agreed with the GAL's recommendation to allocate 50/50 parenting time in part, but disagreed with the schedule the GAL had proposed. The court found that Howard had been more engaged with the children's academics and allocated to him three school nights per week (Mondays, Tuesdays, and Wednesdays) and an alternating weekend day. The court's judgment made numerous references to both parties' responsibility to inform each other of important events or decisions concerning the children, including doctor's appointments, schoolwork, and the administration of medication. Howard

timely appealed this judgment. See Ill. S. Ct. R. 304(b)(6) (eff. Mar. 8, 2016).

¶ 32                                    II. ANALYSIS

¶ 33    Before this court, Howard contends that the trial court's allocation decision was against the manifest weight of the evidence. He requests sole decision-making authority over the children's education, medical choices, and extracurricular activities. He also suggests that we limit Julie's parenting time to Thursdays and every other weekend. We affirm.

¶ 34    The Illinois Marriage and Dissolution of Marriage Act (750 ILCS 5/101 *et seq.* (West 2024)) governs litigation involving the allocation or modification of parental responsibilities, including parenting time. After finding a substantial change in circumstances warranting modification (750 ILCS 5/610.5 (West 2024)), statutory authority requires that a circuit court allocate decision-making responsibilities according to the child's best interests (750 ILCS 5/602.5(a) (West 2024)). The Act sets forth the following factors for the court to consider when assessing best interests:

> "(1) the wishes of the child, taking into account the child's maturity and ability to express reasoned and independent preferences as to decision-making;
>
> (2) the child's adjustment to his or her home, school, and community;
>
> (3) the mental and physical health of all individuals involved;
>
> (4) the ability of the parents to cooperate to make decisions, or the level of conflict between the parties that may affect their ability to share decision-making;
>
> (5) the level of each parent's participation in past significant decision-making with respect to the child;
>
> (6) any prior agreement or course of conduct between the parents relating to decision-making with respect to the child;

(7) the wishes of the parents;

(8) the child's needs;

(9) the distance between the parents' residences, the cost and difficulty of transporting the child, each parent's and the child's daily schedules, and the ability of the parents to cooperate in the arrangement;

(10) whether a restriction on decision-making is appropriate under Section 603.10;

(11) the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child;

(12) the physical violence or threat of physical violence by the child's parent directed against the child;

(13) the occurrence of abuse against the child or other member of the child's household;

(14) whether one of the parents is a sex offender, and if so, the exact nature of the offense and what, if any, treatment in which the parent has successfully participated; and

(15) any other factor that the court expressly finds to be relevant." 750 ILCS 5/602.5(c) (West 2024).

These factors are also considered in the allocation of parenting time as well. See 750 ILCS 5/602.7(b) (West 2024). The trial court is not required to make explicit findings on each factor and is not required to refer to every factor in its judgment. *In re Marriage of Diehl*, 221 Ill. App. 3d 410, 424 (1991). Modification judgments are reviewed under the manifest-weight-of-the-evidence standard. *In re Marriage of Bates*, 212 Ill. 2d 489, 515 (2004).

¶ 35    "A modification of parenting time requires *** 'changed' circumstances, while a modification of the parenting plan or allocation judgment requires a 'substantial change' in

circumstances." *Reynolds v. Reynolds*, 2025 IL App (2d) 240028, ¶ 33. Here, the trial court found that A.C.'s partial hospitalization constituted both a change and a substantial change. Howard does not contest that finding.

¶ 36    Instead, Howard urges (1) Julie "misuse[d] adult Unisom medication"; (2) Julie "stole over one thousand pills" (emphasis omitted.); (3) he "shares the children better and is the better communicator"; (4) Julie's mental health concerns prevent her from parenting; (5) he should not have to exchange the children with Julie on weekends "due to a history of conflict during weekend exchanges"; (6) Julie has a history of failing to communicate medical information to him; (7) he performed "the majority of caretaking functions" in the 24 months preceding the hearing; (8) the court erred by considering the 2022 second allocation judgment, which Schwartz coerced Howard into signing; (9) the court erred in permitting Julie to testify that a doctor recommended a sleep aid, on hearsay grounds; (10) the court erred by finding Schwartz credible, and by considering his recommendations, even though some of the recommendations were favorable to Howard; (11) the court erred to the extent it found Julie credible; and (12) that the trial court judges (both Judge Haxall and Judge DeRue) have a history of bias against him.

¶ 37    Suffice it to say, there is a considerable gap between what the record shows, and what Howard has asserted. To be clear, the record shows that *both* parties have engaged in some *highly* questionable behavior and decision making concerning the children. As the trial court recognized, the parties are quarrelsome and have a toxic relationship. Nevertheless, as the court also found, both parents appear fit to care for the children, without the need for restrictions on their parenting time. The record is also clear that *both* parties entered into an agreed allocation judgment in June 2022, which granted Julie sole decision-making authority, and that under the agreement Howard had significantly less parenting time. Contrary to Howard's assertion, the record does not show he

was under duress such that the 2022 allocation judgment, entered in open court, was somehow invalid.

¶ 38   Further, contrary to what Howard has asserted, the record is clear that the trial court considered all of the evidence at the modification hearing and tailored its judgment to that evidence. Given the established history of the 2022 allocation judgment, the trial court's modification order largely preserved the decision-making status quo. But the order also put a much finer point on Julie's responsibility to notify and consult with Howard, and greatly increased Howard's parenting time. These are all signs that the trial court carefully considered the evidence, that it drew reasonable inferences, and that it modified the parenting plan accordingly. Furthermore, we can comfortably state that our own examination of the record does not reveal any sort of judicial bias against Howard.

¶ 39   Howard's arguments are simply incompatible with the applicable standard of review. "It is no small burden to show that a circuit court's ruling on decision-making responsibilities is against the manifest weight of the evidence." *Jameson v. Williams*, 2020 IL App (3d) 200048, ¶ 50 (citing *In re Marriage of Agers*, 2013 IL App (5th) 120375, ¶ 25)). "A decision is against the manifest weight of the evidence when an opposite conclusion is apparent or when the court's findings appear to be unreasonable, arbitrary, or not based on evidence." *In re Marriage of Verhines*, 2018 IL App (2d) 171034, ¶ 51. In these types of cases, " 'there is a strong and compelling presumption in favor of the result reached by the trial court because it is in a superior position to evaluate the evidence and determine the best interests of the child[ren].' " *Jameson*, 2020 IL App (3d) 200048, ¶ 50 (quoting *Agers*, 2013 IL App (5th) 120375, ¶ 25); see also *In re Marriage of Eckert*, 119 Ill. 2d 316, 330 (1988). It is well settled that we will not reweigh the evidence or set aside the circuit court's decision simply because we might have drawn a different conclusion. *Id.* ¶ 51. The question

we must ask is whether the conclusions drawn by the trial court were reasonable and based on the evidence.

¶ 40    Given the trial court's detailed memorandum judgment, we have little difficulty answering in the affirmative. Furthermore, we cannot say that the evidence compelled that Howard should have sole decision-making authority, or that a parenting-time restriction be imposed on Julie. The record simply does not justify such a drastic restructuring of the children's lives, which has been in place for nearly four years. Under the circumstances, we determine that the circuit court's rulings on decision-making responsibilities and parenting time were not against the manifest weight of the evidence.

¶ 41    Finally, Howard has filed a motion to strike Julie's appellee's brief for claimed violations of Illinois Supreme Court Rule 341(h) (eff. Oct. 1, 2020), which we took with the case. We now deny the motion. We note that the claimed rule violations in Julie's brief—such as using the wrong color cover (the cover is correct, it *is* blue) and incorrect margins—pale in comparison to the violations contained in Howard's briefs such as a highly argumentative statement of facts (*cf.* Rule 341(h)(6)), bare contentions with meager support (*cf.* Rule 341(h)(7)), and appendices including non-record material that the trial court refused to admit (*cf.* Ill. S. Ct. R. 342 (eff. Oct. 1, 2019)). For example, Howard appended material to his opening brief including printed material concerning product lines from the manufacturer of Unisom, which he claims is further "evidence" that Julie had misused the medication and abused the children. Then, appended to Howard's reply brief are roughly 40 pages of his objections to Julie's bystander's report, which the trial court outright rejected as an inaccurate representation of the hearing. These attempted end runs around the rules concerning the record and appellate briefing are *not* well taken.

¶ 42    Child custody matters are serious and sensitive, and in the interest of a complete resolution

of this case, we have elected to ignore these mistakes and the improperly appended materials. See *In re Parentage of Melton*, 321 Ill. App. 3d 823, 826 (2001). That is, we have chosen to treat these errors as misfeasance rather than malfeasance. Nevertheless, we caution both parties—Howard in particular—that the "failure to comply with the rules regarding appellate briefs is not an inconsequential matter" (*Hall v. Naper Gold Hospitality LLC*, 2012 IL App (2d) 111151, ¶ 7), and that our future leniency should not be expected. See *id.* ¶ 15 (striking appellant's brief and dismissing appeal).

¶ 43                                    III. CONCLUSION

¶ 44    For the reasons stated, we deny respondent's motion to strike and affirm the judgment of the circuit court of Lake County.

¶ 45    Affirmed.